**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JEFFREY BISHOP  and MORGAN** | : | **CIVIL ACTION** |
| **BISHOP (h/w) formerly known as** | : | |
| **MORGAN SCOTT** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **CITY OF PHILADEPHIA** | : | |
| **(Department of Prisons)** | : | **NO. 20-3977** |

<u>**MEMORANDUM OPINION**</u>

Savage, J.                                                                          **September 30, 2021**

In this employment case, Jeffrey Bishop and his wife, Morgan Scott,[1] contend the Philadelphia Department of Prisons (PDP)[2], his employer and her former employer, retaliated against them because she had settled a sexual harassment suit against the City.  Bishop also claims that the PDP's disciplining him for his comments on a private PDP employee Facebook group violated his right to free speech and that the PDP failed to promptly pay him overtime in violation of the Fair Labor Standards Act (FLSA).  Scott claims that anonymous letters sent to Bishop mocking her and her settlement were retaliation against her.  They both claim these letters created a hostile work environment.

The City moves for summary judgment, arguing there is no evidence linking any employment actions to Scott's lawsuit and settlement.  It also argues that Bishop's comments on Facebook are not protected under the First Amendment and he was not disciplined for his speech.  With respect to Bishop's FLSA claim, it contends he was paid

---

[1] Morgan Scott took her husband's name upon their marriage in June 2019.  We reference her by her maiden name to distinguish the two plaintiffs.

[2] The defendant is the City of Philadelphia.  Nonetheless, for clarity purposes, we shall refer to the defendant as the Philadelphia Department of Prisons, a department of the City.

overtime within a reasonable time after delays were caused by a failure in the payroll system.

Bishop moves for summary judgment on his First Amendment and FLSA claims. He counters that his Facebook comments are protected speech and disciplining him for them violated his free speech rights. He also claims that the City's undisputed delay in paying overtime violated the FLSA. He filed a separate motion for sanctions for spoliation of evidence that would have identified who was responsible for the retaliation.

Drawing all inferences in favor of Bishop and Scott, we conclude that the PDP is entitled to judgment as a matter of law on their hostile work environment claims, Bishop's free speech and FLSA claims, and Scott's Title VII retaliation claim. There are disputed facts that preclude summary judgment on Bishop's Title VII retaliation claim.

## Background

Bishop joined PDP as a Correctional Officer in February 2013.[3] The following year, he applied and was placed on the PDP's Correction Emergency Response Team (CERT).[4] In 2016, he was promoted to the rank of Correctional Sergeant.[5]

In December 2017, Scott settled a sexual harassment claim against the City for $100,000.[6] Her settlement became public in August 2018 when the *Philadelphia Inquirer* profiled the settlements of two sexual harassment actions against PDP.[7]

---

[3] Def.'s Mot. for Summ. J. Ex. 2 (Bishop PDP Personal Profile) (ECF No. 31-1).

[4] Def.'s Mot. for Summ. J. Ex. 4 at 161:21-162:8 (Bishop Deposition Transcript) (ECF No. 31-1).

[5] *See* Bishop PDP Personal Profile.

[6] *See* Def.'s Mot. for Summ. J. Ex. 9. (Philadelphia Inquirer Article) (ECF No. 31-1).

[7] *Id.*

In June 2019, Bishop and Scott married.[8]  Two months later, Scott took maternity leave.[9]  While on leave, she did not report to PDP facilities or have contact with PDP personnel.[10]  She did not return from maternity leave. Instead, she resigned in August 2020.[11]

In the spring of 2019, PDP implemented a new payroll system called OnePhilly. During rollout, the City encountered difficulties.[12]  PDP clerks struggled with the system in the first two cycles.[13]  During the changeover to the new system, some PDP employees did not receive their regular wages or overtime compensation on schedule.[14]  After identifying the issue, PDP immediately provided additional training to the clerks and sought support from Central Personnel, the Law Department, and the Mayor's Office of Labor Relations to resolve the issue.[15]

OnePhilly's rollout coincided with the PDP's annual Correctional Officer's Week (CO Week), during which PDP hosts activities and ceremonies for its employees.[16]  Participation was voluntary.[17]  Many employees, frustrated with the payroll issues, vented

---

[8] Bishop Dep. Tr. at 52:5-19.

[9] Def.'s Mot. for Summ. J. Ex. 8 at 7:13-21 (Scott Deposition Transcript) (ECF No. 31-1).

[10] *Id*. at 15:2-10.

[11] Def.'s Mot. for Summ. J. Ex. 10. (ECF No. 31-1).

[12] Def.'s Mot. for Summ. J. Ex. 62 at ¶¶ 4, 9, 10 (Beaufort Declaration) (ECF No. 32-6).

[13] *Id*. at ¶ 10.

[14] *Id*. at ¶ 12.

[15] *Id*. at ¶¶ 13-14.

[16] Bishop Dep. Tr. at 38:6-22; *see also* Def's Mot. for Summ. J. Ex. 6 at 13:3-9 (Clark Deposition Transcript) (ECF No. 31-1).

[17] Clark Dep. Tr. at 13:10-16.

on Facebook and some suggested boycotting the celebrations.[18]  They complained in a private Facebook group created by their union.[19]

On April 25, 2019, Bishop commented on two different posts.  He responded to "Who's down with NOT participating in C/O Week? This week is about recognizing and appreciating Correctional Officers! I DON'T FEEL APPRECIATED," with "🐥🐥🐥🐥🐥🐥."[20]  To a post "A rally would be nice," Bishop replied "🐥🐥."[21]  Other posts on the group's page encouraged a potential "sick out" where correctional officers would simultaneously take sick leave to protest the payroll issues.[22]  Bishop did not comment on any of the "sick out" posts and claims not to have seen them.[23]

Around this same time, Bishop was having issues with Sergeant Leslie Williams, a colleague on the Special Events Committee[24] who worked in the Executive Office of the Commissioner.[25]  The committee works with the Commissioner's Office to plan PDP

---

[18] Def.'s Mot. for Summ. J. Ex. 20 (Facebook Posts) (ECF No. 31-1).

[19] Bishop Dep. Tr. at 66:4-23, 67:5-10, 97:1-11.

[20] Facebook Posts at CITY209

[21] *Id.* at CITY210.

[22] *See generally* Facebook Posts. One employee posted a copy of an email from PDP Commissioner Blanche Carney that said: "Dear PDP Staff, We have received word of a possible sick out for next week. Employees are advised that this will be considered an unauthorized job action and may result in disciplinary action for those who participate."  *Id.* at CITY208.

[23] Bishop Dep. Tr. at 111:2-112:18.

[24] *Id.* at 36:8-14.

[25] *See* Def.'s Mot. for Summ. J. Ex. 7 at 14:13-18 (Beaufort Deposition Transcript) (ECF No. 31-1).

events like CO Week.[26]  Bishop had been on the committee since he was selected to join in 2014 or 2015.[27]

In early May, Williams directed Bishop to meet her at Riverside Correctional Facility.[28]  Bishop claims that Williams told him she had authority over him because she was assigned to the Commissioner's Office and that he would "see how much more authority" she had over him.[29]  He claims she "suggested" he step down from the Committee.[30]  The next day, he did.[31]  Williams denies making these statements.[32]

On May 16, Lieutenant Keven Fountain cited Bishop for his Facebook posts as violating PDP policy.[33]  He accused Bishop of failing to intervene or inform his supervisors about certain Facebook posts that could have resulted in a potentially detrimental job action.[34] On May 22, after a preliminary disciplinary hearing, Bishop's case was referred for a formal board hearing.[35]

---

[26] Bishop Dep. Tr. at 32:17-33:2.

[27] Id. at 33:3-9.

[28] Id. at 36:13-37:1; see also Def.'s Mot. for Summ. J. Ex. 21 at 19:24-20:11 (Williams Deposition Transcript) (ECF No. 32).

[29] Bishop Dep. Tr. at 37:2-17.

[30] Id. at 49:23-50:3.

[31] Def.'s Mot. for Summ. J. Ex. 23 (ECF No. 32).

[32] Williams Dep. Tr. at 22:4-7.

[33] Def.'s Mot. for Summ. J. Ex. 11 at 1 (Bishop Employee Violation Report) (ECF No. 31-1); Def.'s Mot. For Summ. J. Ex. 14 at 9:3-22 (ECF No. 31-1) (Fountain Deposition Transcript); see also Def.'s St. of Mat. Facts ¶¶ 44, 49 (admitted by plaintiffs).

[34] "Job action" may be interpreted to mean work stoppage or the encouragement of employees to stop work, which disrupts operations.  Def.'s Mot. for Summ. J. Ex. 13 (ECF No. 31-1); see also Bishop Dep. Tr. at 76:6-19.  See Bishop Employee Violation Report.

[35] Def.'s Mot. for Summ. J. Ex. 15 (ECF No. 31-1).

The hearing was held on July 11, 2019, before a panel consisting of Deputy Commissioner Terence Clark, Deputy Warden Xavier Beaufort, Deputy Warden Patricia Powers, and Sergeant Frederick Reynolds.[36]  The panel concluded that Bishop's "overt action in responding to subordinates. . . demonstrated [he] had knowledge of the planned job action; chose not to intervene or transmit information; and instead showed support."[37] It found him guilty of having "knowledge of an impending job action against the [PDP]" and failing to inform his supervisors about it.[38]

The Board recommended and the Commissioner imposed a fifteen-day suspension.[39]  Bishop was then placed on inactive CERT status by Captain Patrick Pote, the team's new commander.[40]  Bishop appealed his suspension to the Civil Service Commission.[41]

On August 15, the Executive Office of the Commissioner announced that 54 officers, including Bishop, were being transferred to other institutions.[42]  Bishop was

---

[36] Def.'s Mot. for Summ. J. Ex. 17 (ECF No. 31-1) (Disciplinary Hearing Memorandum).

[37] *Id. See also* Pl.s' Resp. to Def.'s Mot. for Summ. J. Ex. B (Bishop Notice of Suspension) (ECF No. 29-3).

[38] *See* Bishop Notice of Suspension.

[39] *Id*.

[40] Bishop Dep. Tr. at 163:22-164:5.

[41] Def.'s Mot. for Summ. J. Ex. 19 (ECF No. 31-1).

[42] Def.'s Mot. for Summ. J. Ex. 36 (August 15, 2019 Transfer Memo) (ECF No. 32-2).

transferred from CFCF to the Detention Center (DC), effective September 2.[43]  He does not know who made the decision to transfer him.[44]

On August 27, Bishop received an anonymous type-written note in his mailbox when he arrived for his shift.[45]  The note foresaw Bishop's shift change resulting from his transfer, saying:

> Congratulations I wish you the best.  I hope you enjoy DC on 3 to 11 Shift. You won't see your Barbie doll girlfriend or children, because I'm having your shift changed.  You started at the top and I'm gonna make sure I end your career at the bottom.  Payback is a bitch. . . .[46]

Bishop reported the anonymous letter to the Philadelphia Police Department and the PDP's Office of Equal Employment Opportunity (EEO).[47]   The EEO assigned Sergeant Wanda Bloodsaw to investigate.[48]   Bishop complained to her that Williams harassed him and created a hostile work environment.  He told Bloodsaw that he believed Williams had written the anonymous note and referenced their May meeting as evidence of prior harassment.[49]  He also blamed Beaufort, who had that year been reassigned to the Executive Office of the Commissioner to assist DC Clark,[50] for instigating his

---

[43] *Id.* at 3.

[44] Bishop Dep. Tr. at 21:20-23.

[45] Bishop Dep. Tr. at 173:14-18; Pl.s' Resp. to Def.'s Mot. for Summ. J. Ex. A (First Anonymous Note) (ECF No. 36-1).

[46] First Anonymous Note.

[47] Bishop Dep. Tr. at 179:21-180:2, 189:22-23; *see also* Def.'s Mot. for Summ. J. Ex. 39 (EEO Complaint Form) (ECF No. 32-2).

[48] Def.'s Mot. for Summ. J. Ex. 41 at CITY241 (Bloodsaw Investigation File) (ECF No. 32-3).

[49] Def.'s Mot. for Summ. J. Ex. 40 at 5-6 (Bloodsaw Interview Record) (ECF No. 32-2).

[50] Beaufort Dep. Tr. at 22:13-23:7.

disciplinary hearing, pressuring a witness at the hearing, removing him from CERT, and initiating his transfer.[51]

Bloodsaw interviewed nine people,[52] including Williams and Beaufort.[53] Williams described her May 6 meeting with Bishop as cordial and denied stating she had "authority" over him.[54] She also denied authoring the anonymous note.[55] Beaufort denied instructing Pote to place Bishop on inactive status. He also denied initiating Bishop's disciplinary proceedings, intimidating a witness at the hearing, and sending an anonymous letter.[56]

Two days after he was transferred to the DC, Bishop and the other DC correctional sergeants received a memo seeking volunteers to move from the 11-7 shift to the 3-11 shift.[57] When no one volunteered, DC Warden Cathy Talmadge changed Bishop's shift.[58]

Before Bloodsaw finished her investigation, Bishop received another anonymous note.[59] On October 1, Lieutenant Mary Rybak gave Bishop the notice of his fifteen-day

---

[51] Bloodsaw Interview Record at 3.

[52] She also interviewed Patricia Powers, Patrick Pote, Keven Fountain, Terence Clark, Mary Rybak, and Melvin Harris, all persons who Bishop mentioned in his interview. Bloodsaw Investigation File at CITY242.

[53] *See* Bloodsaw Investigation File; *see* Beaufort Dep. Tr. at 6:6-16 (Beaufort was promoted to Deputy Commissioner on September 10, 2019).

[54] Bloodsaw Investigation File at CITY248-249.

[55] *Id*.

[56] *Id*. at 249.

[57] Def.'s Mot. for Summ. J. Ex. 45 (ECF No. 32-4).

[58] Def.'s Mot. for Summ. J. Ex. 46 at 11:23-12:5 (Talmadge Deposition Transcript) (ECF No. 32-4).

[59] Bloodsaw Investigation File at CITY247.

8

suspension which had been left on her desk.[60]   Attached to the notice was another

anonymous letter in a PDP Office of Human Resources envelope with "Sgt. Bishop

Detention Center" displayed in the envelope's window.[61]  It said:

> Welcome to DC so you've been calling out, there goes your perfect
> attendance man you had six years no callouts. . . . I'm going to break you
> slowly and mentally to the point where I'm going to make you quit.  I told
> you I'm going to make sure I, end your career.  Well I know your suspension
> days are coming up.  I hope you enjoy your time off because once you get
> back, I'm have something else in store for you.  So enjoy your time off with
> the wife aka barbie doll.  Yeah I heard you and Scott are married now and
> have newborns at home spend that time wisely for now.  Shit with all the
> money she got from her settlement I guess you won't need the overtime
> anymore…. My advice to you is to quit now, before I truly embarrass you.
> You're not as perfect as everyone thinks you are and I'm going to expose
> you. . .[62]

Bishop gave a copy of the letter to Bloodsaw[63] and logged it in the Central Control

electronic logbook.[64]   Bloodsaw interviewed Rybak who told her she did not know who

wrote the letter or left it on her desk. [65]  Bloodsaw concluded that she could not determine

who wrote the anonymous letters and that Bishop's accusations against Williams and

Beaufort were "not sustained" due to a lack of corroborating witnesses.[66]

---

[60] *Id.* at CITY247-248.

[61] Bishop Dep. Tr. at 193:13-17; Def.'s Mot. for Summ. J. Ex. 42 at 2 (ECF No. 32-3).

[62] Pl.s' Stat. of Add. Facts Ex. B. (ECF No. 36-2).

[63] Pl.'s Stat. of Add. Facts. Ex. G at 19:9-17 (Bloodsaw Deposition Transcript) (ECF No. 36-7).

[64] Def.'s Stat. of Undisputed Facts ¶ 132 (admitted by plaintiffs).

[65] Bloodsaw Investigation File at CITY247-248

[66] *Id.* at CITY257.

Almost a year later, on August 20, 2020, Bishop received a third anonymous letter at DC Center Control in an inter-office envelope addressed to him.[67] The note read: "Missing Something from your uniform? Get ready for your next transfer?" along with a photocopied picture of a CERT patch.[68]  Bishop points to this letter as part of a larger pattern of harassment that began in 2019.[69]

A week before Bishop received the third letter, Scott resigned from the PDP on August 14, 2020.[70]  That same day, she and Bishop filed this action.[71]

### Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In examining the motion, we must draw all reasonable inferences in the nonmovant's favor.  *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159–60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the

---

[67] Def.'s Mot. for Summ. J. Ex. 61 (ECF No. 32-6).

[68] *Id*. at Bishop-0092.

[69] Bishop Dep. Tr. at 216:1-17.

[70] *See* Def.'s Mot. For Summ. J. Ex. 60.

[71] *See* Compl. (ECF No. 1).

drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party. FED. R. CIV. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden of production. *Anderson*, 477 U.S. at 252.  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).  A nonmoving party may defeat summary judgment through the use of depositions. *See* FED. R. CIV. P. 56(c)(1)(A) (a plaintiff may assert that a fact is genuinely disputed by "citing to particular parts of materials on the record, including depositions").

**Analysis**

*Count I - Retaliation*

Bishop and Scott claim the PDP retaliated against them for Scott's having brought and settled an earlier sexual harassment lawsuit against the City. The asserted retaliatory acts in this case are the fifteen-day suspension and loss of CERT status, the transfer to another prison, and the shift-change.    The City contends that there is no evidence connecting Scott's settlement to any of the employment actions.  It argues there is no

causal connection between his transfer and shift change to his wife's settlement because none of Bishop's supervisors were aware of Bishop's protected activity.  Bishop counters that the City ignores key evidence—the anonymous letters where someone "specifically takes credit for [Bishop's] 'shift change' and notes how difficult [the shift change] will make it for Sgt. Bishop to 'see [his] Barbie doll girlfriend or children'" and mentions "all the money she got from her settlement."[72]

Because Bishop and Scott do not rely on direct evidence, their retaliation claims are governed by the burden-shifting *McDonnell Douglas* analysis.  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).  Under that analysis, Bishop and Scott must first establish a *prima facie* case of retaliation.  *Id.*  If they fail to establish a *prima facie* case, the City is entitled to judgment as a matter of law.

If they succeed in establishing a *prima facie* case, the burden shifts to the City to present a legitimate, non-retaliatory reason for its action.  *Id.*  If it does, then "'the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'"  *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006) (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500–01 (3d Cir. 1997)).  Even if the employer's excuse is false, the real reason must be discriminatory retaliation, not some other reason, such as personal animosity.

To establish a *prima facie* case of retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in protected activity; (2) his employer took adverse employment action against him after or contemporaneously with his protected activity;

---

[72] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 5 (ECF No. 34).

and (3) there was a causal connection between his protected activity and the adverse employment action.  *Daniels*, 776 F.3d at 193; *Moore,* 461 F.3d at 340–41.[73]

Bishop and Scott contend they were retaliated against for her having filed and settled a sexual harassment lawsuit against the City for actions that had occurred in the prison system. The City argues that because Bishop did not engage in any protected activity and only Scott did, Bishop cannot satisfy the first element of a *prima facie* case of retaliation.

A closely related person to one engaging in protected activity may bring an action for retaliation based on the relative's protected activity. *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 173–74 (2011). Stated differently, an employer may be liable for retaliating against an employee because he is related to one who engaged in protected activity.  Thus, as Scott's husband, Bishop can be the target of retaliation resulting from his wife's successfully bringing a sexual harassment lawsuit.

Having determined that Bishop and Scott engaged in protected activity, we consider whether they suffered an adverse employment action.  An "adverse employment action" is "one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (internal citation and quotation marks omitted).  What qualifies as an adverse employment action is broader than the statutory definition.  It includes "'firing, failing to promote, reassignment with significantly different responsibilities, or a decision

---

[73] Bishop and Scott bring retaliation claims under 42 U.S.C. § 2000e ("Title VII"), the PHRA, and the PFPO, which are analyzed the same.  *See e.g. Dici v. Pennsylvania*., 91 F.3d 542, 552 (3d Cir. 1996) (the PHRA is applied in a similar manner as Title VII); *see also Joseph v. Cont'l Airlines, Inc*., 126 F.Supp.2d 373, 376 n.3 (E.D. Pa. 2000) (analysis of a claim under Title VII applies in equal force to the PFPO).

causing a significant change in benefits,'" *Remp v. Alcon Labs., Inc.*, 701 F. App'x 103, 106–07 (3d Cir. 2017) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); reassigning an employee to a "dead-end" position that was soon eliminated, *Torre v. Casio, Inc.*, 42 F.3d 825, 831 (3d Cir. 1994); and giving an employee a potentially less profitable position, *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 319 (3d Cir. 2000).   On the other hand, lateral transfers or changes in title absent evidence of a material change in an employee's working conditions generally do not constitute adverse employment actions.  *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 234 (3d Cir. 2016) (citations omitted); *see also Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013), *aff'd*. 776 F.3d 181 (3d Cir. 2015) (to constitute an adverse employment action, transfers must "be detrimental or undesirable in some objective way").

Bishop was moved from a shift he preferred to one he did not.  He claims he lost overtime opportunities and the new shift was less desirable.  Rejecting any notion that the action was retaliatory, the City contends it was part of a routine, periodic rotation of personnel.  It points out that Bishop was one of 54 employees transferred, 17 of whom were sergeants.  Warden Talmadge testified that the 11-7 shift, Bishop's preferred shift, had too many sergeants while the 3-11 shift was short-handed.  It is undisputed that Bishop had the least seniority of the sergeants who could have been transferred to the 3-11 shift.[74]

Whether a transfer or reassignment is an adverse employment action depends on the circumstances of the case. Because it calls for a factual determination, it is a jury

---

[74] Bishop Dep. Tr. at 211:1-4.

question. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)) ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'") (internal quotations and citations omitted); *see also Washco v. Federal Express Corp.,* 402 F. Supp. 2d 547, 558 (E.D. Pa. 2005) ("[A] plaintiff can survive summary judgment without alleging a reduction in pay or benefits, provided that the plaintiff alleges other facts demonstrating that the transfer was in some way adverse").  Bishop claims that the transfer and resulting shift-change impacted his earning ability because he could not accrue overtime.[75]  He has produced evidence of his earnings and pay records to substantiate his losses.[76]

Because Bishop has presented evidence that his transfer and shift change adversely affected his earning potential and materially changed his job, he has satisfied the adverse employment element.  On the other hand, his removal from CERT was not an adverse employment action.  As a member of the team, he enjoyed no extra compensation, benefits, or privileges.

Unlike Bishop, Scott suffered no retaliatory action. She argues that she was targeted as the "Barbie doll girlfriend" and "Barbie doll wife" who received money from her settlement. Although she characterizes these statements as having been made "in a threatening and harassing manner," they are not. More importantly, they were not addressed to her. They were made in anonymous letters to her husband who shared

---

[75] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 3.

[76] Pl.'s Stat. of Add. Facts Exs. D (ECF No. 36-4) and E (ECF No. 36-5).

them with her. He was the target, not she.  Because she offers nothing more, she cannot establish that the City took any retaliatory action against her, an essential element of a retaliation claim.

Bishop still must present evidence demonstrating a causal link between the protected activity and his transfer and shift change.  The City maintains that he cannot identify any person with a discriminatory animus who sent the anonymous letters and made the decision to transfer him and change his shift.  Bishop acknowledges he cannot specifically identify the decision-makers, but blames the City for destroying or losing the evidence that would reveal the identity of those who participated in having him transferred.

Bishop argues that the City knew he claimed the decision to transfer him was made by someone with *respondeat superior* liability. Deputy Warden of Deployment Marco Giannetta testified that the list that would have shown who proposed his transfer was lost in August 2020[77] after Bishop had already claimed retaliation at his EEOC proceeding in October 2019.[78]  Because the City was on notice of this claim before the evidence was lost, Bishop believes he is entitled to an adverse inference.[79]

"Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. UPS*, 665 F.3d 68, 73 (3d Cir. 2012).  To establish the

---

[77] Pl.'s Third Mot. for Sanctions Ex. L at 7:4-8:3 (Giannetta Deposition Transcript) (ECF No. 33-1).

[78] Pl.'s Third Mot. for Sanctions Ex. M at ¶ 42 (ECF No. 33-2).

[79] Pl.'s Third Mot. for Sanctions at 9 (ECF No. 33).

third requirement, actual suppression or withholding of evidence, the party asserting spoliation must show that the party withholding the evidence acted in bad faith and not by inadvertence or accident.

At his deposition, Giannetta explained that his job is to ensure adequate staffing at each facility by keeping track of vacancies and reporting where people are needed.[80] He stated that he "probably was given a list of people" proposed for transfer, and, if he had, it would have been lost when he moved offices in August 2020.[81]  He no longer has any documents that he may have used to create the August 15, 2019 list.[82]   He claims that if he had been asked in November 2019 who prepared the names for the transfer, he could have produced the information.[83]   Giannetta denied he knew that Bishop was claiming that he was transferred in retaliation for the Scott lawsuit.[84]

At this time, there are insufficient facts to show the City acted in bad faith in failing to preserve the notes.  Although Giannetta explained that the notes and list were lost when he moved his office, his explanation is subject to a credibility determination. Whether Bishop is entitled to an adverse inference jury instruction must await factual development.   Nonetheless, despite the absence of Giannetta's notes, Bishop has presented sufficient facts from which a reasonable jury could infer that a PDP supervisor was involved in his transfer and shift-change, and that the actions were retaliatory.

---

[80] Giannetta Dep. Tr. at 5:17-6:8.

[81] *Id*. at 7:10-24.

[82] *Id.* at 6:23-7:9.

[83] *Id*. at 11:4-10.

[84] *Id*. at 11:17-12:4.

Despite Bishop's repeated requests for documents generated in the process that resulted in his transfer, the City has not provided them.  It offers testimony that describes the process generically.  It does not answer why Bishop specifically was chosen, standing on its claim that he was randomly selected.   But the evidence suggests otherwise.  Giannetta testified that he compiled the transfer list from recommendations from Beaufort and Clark, two of the antagonists Bishop claims were responsible.[85]  Giannetta testified the list was lost when he changed offices.  As a consequence, he cannot identify who placed Bishop on the list.

Bishop has produced circumstantial evidence, if believed, that shows someone in a supervisory position was responsible for transferring him and changing his shift.  The evidence links the anonymous letters to someone in the decision-making process.  The letters refer to his wife's lawsuit and settlement, providing the retaliatory animus.  Only someone in that process could have known the shift change was coming.

That Bishop cannot identify with certainty who the responsible person was is not fatal to his claim.  All that he has to show is that it was someone in a supervisory position. It is up to the jury to determine if he has done so.

Bishop having established a *prima facie* case, the burden shifts to the City to "'advance a legitimate, non-retaliatory reason for its adverse employment action.'" *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003) (quoting *Krouse*, 126 F.3d at 500).  The defendant's burden is "relatively light." *Krouse*, 126 F.3d at 501 (internal citations omitted).   The burden "'is satisfied if the defendant articulates any legitimate reason'" for the adverse employment action.  *Shellenberger*, 318 F.3d at 189

---

[85] *Id.* at 10:18-22.

(quoting *Krouse,* 126 F.3d at 500).  The defendant's burden is one of production, not persuasion. *Kengerski v. Harper,* 6 F.4th 531, 536 n.3 (3d Cir. 2021).  It "need not prove that the tendered reason *actually* motivated" its decision.  *Shellenberger*, 318 F.3d at 189 (quoting *Krouse,* 126 F.3d at 500).  It "need only raise a genuine issue of fact as to whether the employer" could have been motivated by the proffered legitimate, non-retaliatory reason. *Id. (citing Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981))*.

The City has met its burden.  It has presented evidence that its decision to transfer Bishop was random and that his shift-change was made to address staffing needs in conformity with seniority.

The City having shown legitimate reasons for transferring Bishop and changing his shift, the burden shifts back to Bishop to discredit the City's proffered justification or present evidence that he was transferred in retaliation for his wife's protected activity. *Lupyan v. Corinthian Colls. Inc.*, 761 F.3d 314, 324 (3d Cir. 2014) (citing *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir. 1994)).  A plaintiff may discredit the proffered reason by demonstrating such "'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' from which a reasonable juror could conclude that the Defendants' explanation is 'unworthy of credence'" and infer that the employer actually acted in retaliation. *Carvalho–Grevious v. Del. State Univ.*, 851 F.3d 249, 262 (3d Cir. 2017) (quoting *Daniels*, 776 F.3d at 199).

The author of the first anonymous note knew that after Bishop was transferred, he would be the one most likely selected for the undesirable shift-change.   Although the

transfer had been announced, the shift change had not.  Thus, the author was someone in a position to effectuate the change and knew it was coming.

If, as Bishop contends, the transfer list was curated specifically to leave open one sergeant's spot on an undesirable shift at the DC and he would be the one to fill it, the identities of those participating in its creation would reveal who was responsible.

Clark, at his deposition, claimed Bishop was selected "randomly" for transfer.[86] He explained that the list of transferees, which comes from Deployment or Human Resources, is given to the deputy commissioners[87] who can make changes before submitting it to the Commissioner, who ultimately decides whom to transfer.[88]  Giannetta agreed that, "for the most part," more than one person selected the transferees.[89]  Clark did not believe that Beaufort played a role in choosing Bishop for transfer, but conceded he could have.[90]

Beaufort denied having a role in the August 15 transfers.[91]  He also denied writing the note and claimed that he first saw it during his interview with Bloodsaw.[92]  He did hear rumors of Scott's settlement.[93]

---

[86] Clark Dep. Tr. at 30:2-8.

[87] *Id*. at 32:20-33:12, 35:22-37:7.

[88] *Id*.

[89] Giannetta Dep. Tr. at 5:7-16.

[90] Clark Dep. Tr. at 36:21-37:11.

[91] Beaufort Dep. Tr. at 25:23-26:18.

[92] *Id*. at 27:20-28:12.

[93] *Id*. at 12:13-22.

A jury could reasonably infer that Beaufort, notwithstanding his denials, recommended Bishop for transfer.  Even though Beaufort was not officially promoted until after the transfer took place, his presence in the Executive Office of the Commissioner with Williams, coupled with his work assisting Clark as a *de facto* Deputy Commissioner in the weeks leading up to his promotion, is enough for a reasonable juror to infer that he had a hand in the process.[94]

Bishop has produced sufficient evidence from which a reasonable jury could infer that someone in management sent the anonymous letters and engineered his transfer and shift change.  The author of the letters could only have been in an inside position with knowledge of the process and what was coming.  Giannetta narrowed that to Clark and Beaufort.  That Bishop is unable to establish which one or both is not dispositive.  They are both persons who can have *respondeat superior* liability.  Their denials are for a factfinder to assess.  The jury need not place blame on either one as long as it finds that it was either one.  Thus, we shall deny the City's motion for summary judgment on Bishop's retaliation claim.

*Count II - Hostile Work Environment*

The City moves for summary judgment on the hostile work environment count, arguing that it is another retaliation claim.  Bishop insists that it is not a retaliation claim, but a hostile work environment claim.[95]  Because Bishop clarified that Count II is not premised on the theory of a retaliatory hostile work environment, we evaluate it as a

---

[94] *Id.* at 22:13-23:7.

[95] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9 (arguing that, for Count II, retaliation "is not what is pled; hostile work environment is").

traditional Title VII hostile work environment claim arising from intentional discrimination rather than a retaliatory hostile work environment claim.

A Title VII hostile work environment claim is distinct from a retaliatory hostile work environment claim.   They are separate bases of liability under Title VII's retaliation provision.  *Smith v. RB Distrib., Inc.*, 498 F.Supp.3d 645, 660–63 (E.D. Pa. 2020) (holding that a claim of retaliatory hostile work environment "is based on a contention that the employer permitted a hostile environment to develop as a result of an employee's opposition to an illegal practice or participation in a Title VII proceeding"); *see also Komis v. Sec'y of the U.S. Dep't of Lab.*, 918 F.3d 289 (3d Cir. 2019)).

A hostile work environment claim does not exist by itself.   *Mandel v. M & Q Packaging Corp.,* 706 F.3d 157, 167 (3d Cir. 2013).   It must be related to unlawful intentional discrimination.   *See Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), *overruled on other grounds by Burlington*, 548 U.S. 53 (holding the plaintiff must establish that he "suffered intentional discrimination because of" his protected activity).   In other words, the harassment must be motivated by a discriminatory animus.

Bishop and Scott claim they were subjected to a hostile work environment in violation of Title VII, the PHRA, and the PFPO.[96]   They argue that because the anonymous notes were written by someone with "jealousy of a sexual nature toward" Scott and her settlement, they are both protected from discrimination based on the characteristic of sex.[97]

---

[96] Claims under Title VII, the PHRA, and the PFPO are analyzed under the same standard. *See Goosby*, 228 F.3d at 317 n.3 (Title VII and the PHRA are analyzed under the same standards); *Joseph*, 126 F. Supp. 2d at 376, n.3 (Title VII and PFPO analyzed under the same standard).

[97] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 9.

Not all workplace harassment violates Title VII,[98] the PHRA,[99] or the PFPO.[100] Indeed, Title VII "does not set forth 'a general civility code for the American workplace.'" *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68 (quoting *Oncale*, 523 U.S. at 80).  It does not prohibit "all verbal or physical harassment in the workplace[.]"  *Id*.  The letters, no matter how distasteful, do not alone establish a hostile work environment.

Only harassment motivated by a discriminatory animus is prohibited.  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 278 (3d Cir. 2001) (citing *Spain v. Gallegos*, 26 F.3d 439, 447–48 (3d Cir. 1994)).  In other words, the harassment must be instigated by unlawful discrimination.  Jealousy of a coworker's relationship is not sex discrimination.  *See e.g., Falconer v. Papco, Inc.,* No. 06-247, 2008 WL 2486128 (W.D. Pa., Jun. 17, 2008) (rejecting plaintiff's theory that her having been "terminated because of [her supervisor's] jealousy over her alleged affair can be characterized as gender-driven discrimination within the meaning of Title VII" and granting summary judgment for employer in discriminatory discharge claim).[101]

---

[98] Title VII protects against discrimination based on an individual's "race, color, religion, sex, or national origin…"  42 U.S.C. § 2000e-2(a).

[99] The PHRA protects against discrimination based on an individual's "race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap…"  43 Pa. Stat. § 955.

[100] The PFPO protects against discrimination based on an individual's "race, ethnicity, color, sex (including pregnancy, childbirth, or a related medical condition), sexual orientation, gender identity, religion, national origin, ancestry, age, disability, marital status, familial status, genetic information, or domestic or sexual violence victim status…"  Phila. Code, Title 9, Chapter § 9-1103(1).

[101] *See also Blackshear v. Interstate Brands Corp.*, No.09-06, 2010 WL 2045195 at *5 (S.D. Ohio, May 21, 2010) (granting summary judgment in Title VII discrimination case based on sex where "purported mistreatment of Plaintiff was not because Plaintiff was a female but because Plaintiff was a person (regardless of gender) who was involved in a relationship" with a colleague because "[m]ere jealousy… however distasteful or immature, does not equate to discrimination, harassment, or retaliation based on gender");  *Huffman v. City of Prairie Village, Kansas,* 980 F. Supp. 1192, 1199 (D. Kan. 1997) (holding that a supervisor did not discriminate on the basis of sex under Title VII when the supervisor, "in a jealous rage" over plaintiff's romantic involvement with a fellow employee, created a hostile work environment for plaintiff);  *Bush v. Raymond Corp.*, 954 F. Supp. 490, 498 (N.D.N.Y. 1997) (granting summary judgment for employer

The anonymous letters referencing Scott as his "Barbie Doll" wife and girlfriend are not evidence of sex discrimination.  Nor were they directed at her.  The author's comments about Scott do not show discrimination based on gender.  While Bishop argues that either "jealousy of a sexual nature" or jealousy of "all the money she got" from her settlement was the motivation behind the notes, neither forms the basis of a sex discrimination claim. Thus, both Bishop and Scott's hostile work environment claims fail.

*Counts III and IV - Free Speech Retaliation*

Bishop claims that he was retaliated against for his Facebook comments in support of his colleagues' frustrations about the OnePhilly payroll system.  He asserts the 15-day suspension and removal from CERT in retaliation for his speaking out violated his right to free speech under both the First Amendment and Pennsylvania Constitution.

Bishop was disciplined not for his comments on Facebook, but for failing to report a potential job action that could have affected the safety and security of the prison. For this reason alone, his free speech claims fail.

Even if he had been disciplined for what he said in the posts, his claims still fail.[102] His comments were not protected speech.

The right to free speech includes not only the affirmative right to speak, but also the right to be free from retaliation by a public employer for exercising that right.  A

---

in discriminatory discharge claim and holding that plaintiff being terminated because her supervisor was jealous of her alleged affair is "clearly" insufficient to support a claim of sex discrimination under Title VII).

[102] *See* Bishop Employee Violation Report ("Bishop specifically, you expressed in your social media post under your name, emojis of clapping hands and a face with and [sic] eyeglass monocle.  Your other thread displayed emojis of fire.  Your response of emojis demonstrated that you had knowledge of the planned job action; chose not to intervene or transmit information; and instead showed support.  Based on your conduct, you are found in violation of General Orders #1, #5, and #26 respectively, and Job Action Policy, 3.B.11").  Neither the General Orders nor the Job Action Policy make any reference to the content of Bishop's speech.

government employer cannot retaliate against an employee for exercising his free speech rights.  *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968); *Montone v. City of Jersey City,* 709 F.3d 181, 193–95 (3d. Cir. 2013) (quoting *Azzaro v. County of Allegheny*, 110 F.3d 968 (3d Cir. 1997) (en banc)); *DiMeglio v. Haines*, 45 F.3d 790, 804 (4th Cir. 1995).

As a threshold matter, we must decide whether Bishop's Facebook comments were protected by the First Amendment.[103]   Public employees speaking on matters related to their employment are not afforded the same First Amendment protection as are private citizens. *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006); *De Ritis v. Roger*, 861 F.3d 444, 457 (3d Cir. 2017) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2381 (2014)). When the government acts as an employer, rather than as a regulator of private conduct, it has significantly stronger interests in restricting speech.  To operate effectively, "public employees' First Amendment rights are limited by the Government's countervailing interest in efficient provision of public services."  *De Ritis*, 861 F.3d at 452 (citing *Lane*, 134 S. Ct. at 2377); *see Garcetti*, 547 U.S. at 418–19 (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)).  Still, a government employee remains a citizen and may speak out as a citizen about matters of public concern.  *Garcetti*, 547 U.S. at 419 (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).  Hence, the government employer may only impose speech restrictions that are necessary to operate efficiently and effectively.  *Id.* (citing *Connick*, 461 U.S. at 147).

---

[103] Whether speech is constitutionally protected is analyzed the same across both claims.  *See Bonilla v. City of Allentown*, 359 F.Supp. 3d 281, 302 (E.D. Pa. 2019) (Analyzing the "free speech aspects of [both federal and Pennsylvania state] counts" together and holding that "the claims fail as a matter of law because Bonilla's speech on April 7, 2014, did not involve a matter of public concern").

A public employee's speech is protected by the First Amendment when: (1) the employee speaks as a citizen and not as an employee; (2) his statement involves a matter of public concern; and (3) the government employer lacked an "adequate justification" in treating him differently than a member of the general public for making the same statement.  *De Ritis*, 861 F.3d at 452 (citing *Pickering*, 391 U.S. 563); *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 466 (3d Cir. 2015)).

We examine the statements to determine whether they address a matter of concern to the community, not of personal concern.  *Miller v. Clinton County.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick*, 461 U.S. at 146–48).  If the speech focuses on employment grievances, such as office morale or matters of purely personal interest, it does not address political or social concerns. *Munroe*, 805 F.3d at 467.

Viewed in context, Bishop's comments demonstrate that he was speaking from his personal position as a PDP employee, not as a citizen.  His statements were made in a private Facebook group with other PDP guards.  The first post he commented on proposed boycotting the voluntary events of CO Week to demonstrate employees' dissatisfaction.[104]  The second called for a rally to complain about employees not getting their paychecks on time.[105]

These conversations did not implicate matters of public concern or government policy.  They were airing employees' personal grievances.  Bishop merely affirmed his colleagues' complaints about untimely paychecks.  His complaints were "calculated to redress personal grievances," rather than to serve a "broader public purpose."  *Singer v.*

---

[104] Facebook Posts at CITY209.

[105] *Id*. at CITY210.

*Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (quoting *Lewis v. Cowen*, 165 F.3d 154, 163 (2d Cir. 1999)); *see also De Ritis*, 861 F.3d at 455 (quoting *Miller*, 544 F.3d at 551) ("[I]f a discrete unit of speech addresses only the employee's own problems, and even if those problems 'brush . . . against a matter of public concern' by virtue of that employee's public employment, then that speech is merely a 'personal grievance.'" (emphasis omitted)).

Because Bishop cannot show that he was speaking on a matter of public concern, he cannot establish that his speech was constitutionally protected.  Thus, we shall deny his motion for partial summary judgment and grant the City's motion as to his free speech retaliation claims.

### Count V - Fair Labor Standards Act

Bishop claims the City violated the FLSA because his overtime pay was late on eight occasions.[106]  The City argues it never violated the FLSA and, even if it did, it has a "reasonable good faith defense."[107]  Bishop responds that the payroll system's failure was not the reason for many of his untimely payments.[108]

The FLSA requires that non-exempt employees must be paid time and a half for work over forty hours per week.  29 U.S.C. § 207(a).  If the employer fails to provide overtime in a timely manner, employees are entitled to liquidated damages even if they are eventually paid.  *See* 29 U.S.C. § 216(b).  In *Brooks v. Village of Ridgefield Park*, the Third Circuit held that an employer violates the FLSA if the delay is not reasonably necessary.  185 F.3d 130, 135–37 (3d. Cir. 1999) (holding that a municipal policy that

---

[106] *See generally* Pl.'s Mot. for Partial Summ. J. on FLSA Claims (ECF No. 37).

[107] Def.'s Mot. for Summ. J. at 22-24.

[108] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 14-15.

paid overtime to police officers every six weeks instead of every two weeks violated the FLSA).

The *Brooks* court explained that "the FLSA does not specifically address *when* overtime compensation must be paid." *Id.* at 135 (emphasis added).  It relied on a DOL "interpretive bulletin," 29 C.F.R. § 778.106.[109]  *Id.*  It states:

> The general rule is that overtime compensation earned in a particular workweek must be paid on the regular pay day for the period in which such workweek ends. When the correct amount of overtime compensation cannot be determined until some time after the regular pay period, however, the requirements of the Act will be satisfied if the employer pays the excess overtime compensation as soon after the regular pay period as is practicable. Payment may not be delayed for a period longer than is reasonably necessary for the employer to compute and arrange for payment of the amount due and in no event may payment be delayed beyond the next payday after such computation can be made.

§ 778.106.  Adopting this interpretation, the Third Circuit held that the threshold question in a claim for delayed overtime is whether the purported delay was "reasonably necessary." *Id.*

Bishop argues the City violated the FLSA when it delayed his overtime payments eight times.[110]  He claims these delays violated the FLSA and entitle him to liquidated damages.[111]  To substantiate his claims, he relies on City payroll data.[112]

---

[109] The Third Circuit found the bulletin was a "reasonable construction of the FLSA."  *Id.* at 135-36.

[110] Pl.'s Resp. to Def.'s Mot. for Summ. J. at 13-15.

[111] *Id.* at 15.

[112] Pl.'s Stat. of Add. Facts Ex. E (ECF No. 36-5) (Overtime Data)

The City contends that its data shows Bishop received his overtime payments in the following pay period.[113]   Deputy Commissioner Beaufort, who now oversees the payroll department for the PDP, stated that within the first two OnePhilly payroll cycles, all problems were corrected and that overtime compensation was paid  "immediately following the pay period in which the overtime compensation was earned."[114]   The data confirms the City's position.[115]

In each of these seven instances where Bishop claims his overtime was "unreasonably delayed," he was paid in the next pay period.[116]   For example, Bishop's chart of the City's data shows that after he worked eight overtime hours during the pay period of April 22 to May 5, 2019, the overtime pay was added to his next paycheck for the two-week period of May 6 to May 19, the next pay period.[117]   Put differently, the data shows he was always paid for overtime in the *following* pay cycle.[118]

Finally, Bishop points to an April 9, 2021 email to the payroll department claiming he was not compensated for all of the overtime he worked.[119]   Later that day, a member

---

[113] *See* Def.'s Mot. In Resp. to Pl.'s Cross Mot. for Partial Summ. J. at 2-3 (ECF No. 44); *see also* Def.'s Mot. for Summ. J. at 24.

[114] *See* Beaufort Declaration at ¶¶ 10-12.

[115] *See* Overtime Data.

[116] *Id.*

[117] *Id.*

[118] *Id.*

[119] Pl.'s Stat. of Add. Facts Ex. L (ECF 36-12).

of the payroll unit responded to Bishop, corrected the mistake, and assured him that he would receive these earnings in his next pay.[120]

The City's delay in providing Bishop overtime compensation was not unreasonable. The data demonstrates that it always compensated Bishop for missed overtime in the next pay cycle. There is no evidence of an unreasonable delay. Therefore, we shall grant the City's motion for summary judgment and deny Bishop's motion for summary judgment on the FLSA claim.[121]

### Conclusion

The City is entitled to judgment as a matter of law on Bishop's claims for hostile work environment, free speech retaliation, and an FLSA violation, and Scott's retaliation and hostile work environment claims. There are disputed facts that preclude summary judgment on Bishop's Title VII retaliation claim. Thus, we shall deny Bishop's motions for partial summary judgment on his free speech and FLSA claims and grant the City's motion for summary judgment in part and deny it in part.

---

[120] *Id.*

[121] Even if we were to find the City's delay in overtime payment was not "reasonably necessary," it has a partial or complete defense if it can prove it acted in "reasonable good faith."[121]  29 U.S.C. § 260; *Brooks*, 185 F.3d at 137.  To establish this defense, the employer must show that, prior to the violation, it had "an honest intention to ascertain and follow the dictates of the FLSA" and acted "'as a reasonably prudent [person] would have acted under the same circumstances.'"  *Brooks*, 185 F.3d at 137; *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 910 (3d Cir. 1991).  If the employer acted in "reasonable good faith," it is not liable for liquidated damages.  *Brooks*, 185 F.3d at 137; 29 U.S.C. § 260.